13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


WORLDS, INC.,                  )
                               )
            Plaintiff,         )
                               ) C.A. No. 19-1773(MN)
v.                             )
                               )
LINDEN RESEARCH, INC.,         )
                               )
            Defendant.         )



                    Friday, November 13, 2020
                    10:00 a.m.
                    Markman Hearing (Remote)


                    844 King Street
                    Wilmington, Delaware



BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


          RATNERPRESTIA
          BY:  JEFFREY B. BOVE, ESQ.
          BY:  KAREN R. POPPEL, ESQ.

          -and-

          DAVIDSON BERQUIST JACKSON & GOWDY, LLP
          BY:  WAYNE M. HELGE, ESQ.
          BY:  JAMES WILSON, ESQ.


                    Counsel for the Plaintiff

1    **APPEARANCES CONTINUED:**

2

3

4                **POTTER ANDERSON & CORROON LLP**
                 **BY:  DAVID E. MOORE, ESQ.**
                 **BY:  BINDU ANN PALAPURA, ESQ.**

5

6                **-and-**

7                **FENWICK & WEST LLP**
                 **BY:  MICHAEL J. SACKSTEDER, ESQ.**
                 **BY:  M. CONNER HUTCHISSON, ESQ.**

8

9                     **Counsel for the Defendant**

10

11                     **– – – – – – – – –**

12

09:51:13  13

10:00:50  14          **THE COURT:  Good morning, counsel.  Who is**

10:00:52  15    **there, please?**

10:05:21  16          **MR. BOVE:  Good morning, Your Honor.  This is**

10:05:22  17    **Jeff Bove from RatnerPrestia.  And I will introduce the rest**

10:05:27  18    **of my team if the Court would like.  I have on the line**

10:05:31  19    **Karen Poppel from my firm, and lead counsel Wayne Helge.  He**

10:05:36  20    **has with him James Wilson.  They're from Davidson, Berquist,**

10:05:41  21    **Jackson & Gowdey.  Mr. Helge will be handling the argument**

10:05:44  22    **today.**

10:05:45  23          **THE COURT:  Good morning to all of you.**

10:05:49  24          **MR. MOORE:  Good morning.  For the Defendant,**

10:05:51  25    **this is David Moore from Potter Anderson.  With me on the**

10:05:55 1    line are --

10:05:55 2              THE COURT:  Mr. Moore, we cannot understand you.

10:05:59 3    You sound like you're under water.

10:06:00 4              MR. MOORE:  Really?

10:06:02 5              THE COURT:  It's better actually when you sit

10:06:04 6    back.  Try that.

10:06:05 7              MR. MOORE:  Okay.  Good morning, Your Honor.

10:06:07 8    David Moore from Potter Anderson along with Bindu Palapura.

10:06:13 9    We have with us on the line from Fenwick & West, Michael

10:06:18 10   Sacksteder and Conner Hutchisson.  Mr. Sacksteder will be

10:06:21 11   presenting.

10:06:22 12             THE COURT:  Good morning to all of you as well.

10:06:26 13   So thank you all for being on the line.  We are here for

10:06:29 14   arguments on the disputed claim terms.  We're doing this by

10:06:33 15   Zoom.  That presents a few challenges, but I'm sure that we

10:06:37 16   can make it work.

10:06:38 17             I have the slides submitted by each party and I

10:06:41 18   will ask that you identify slides by number when you refer

10:06:45 19   to them.  I realize that you may always put them up for me

10:06:49 20   to look at, but it's helpful for the record if you make

10:06:52 21   clear what number you're looking at.  Also I have the

10:06:54 22   patents and the joint appendix volumes in front of me.  I

10:06:58 23   ask that if you refer me to something in those that's not on

10:07:01 24   the slide, you give me a minute or two to get the correct

10:07:04 25   page so that I can follow your arguments.

10:07:07 1          One of the challenges of doing this remotely is

10:07:10 2     that it's harder for me to ask questions.  I'm on the phone

10:07:14 3     and there is often a delay when I start talking such that

10:07:17 4     the attorneys keep talking until I say "wait, wait" a few

10:07:20 5     times because the system doesn't click over and let them

10:07:23 6     hear that I'm asking a question.  So I'll just ask you to be

10:07:27 7     mindful to listen for questions or maybe stop every once in

10:07:30 8     a while to see if I have any.

10:07:33 9          Finally, I will remind everyone on the phone

10:07:37 10    that recording or broadcasting these proceedings is

10:07:40 11    prohibited.

10:07:41 12         Are there any questions before we begin?

10:07:48 13         MR. HELGE:  Not from the Plaintiff's side, Your

10:07:50 14    Honor.  Thank you.

10:07:50 15         THE COURT:  Okay.  I would like to go term by

10:07:57 16    term in the order they were in the brief, although I do

10:08:00 17    understand there is some overlap for some terms like current

10:08:04 18    process and server process, so if we need to group those,

10:08:07 19    that is fine.

10:08:09 20         Let me hear from the Plaintiff first.

10:08:12 21         MR. HELGE:  Again, good morning, Your Honor.

10:08:15 22    Thank you very much.  I would like to share the presentation

10:08:18 23    that we sent Your Honor yesterday morning, and we'll begin

10:08:22 24    talking about avatar.  Just to be clear, Your Honor, I

10:08:25 25    understand you would like to go term by term.  My

10:08:28 1  understanding is that you have read the tutorial

10:08:32 2  presentations that we sent in I guess it was about a month

10:08:35 3  ago now, so I will not present any of that.  Is that

10:08:39 4  understanding correct, Your Honor?

10:08:40 5           THE COURT:  Yes, that's fine.  I have looked at

10:08:43 6  that tutorial that was submitted.

10:08:44 7           MR. HELGE:  Thank you, Your Honor.  So I will

10:08:46 8  share my screen now, Your Honor, and I'm going to pull up

10:08:50 9  our presentation on the disputed terms.  And as Your Honor

10:08:56 10 mentioned, let's see if this shows up correctly.  It may be

10:09:03 11 the wrong -- I'm sorry, Your Honor.  There we go.

10:09:09 12           Your Honor, so I'm going to show -- you should

10:09:14 13 see, Your Honor, on your screen the presentation that's

10:09:18 14 entitled Worlds, Inc. v. Linden Research, Incorporated Claim

10:09:23 15 Construction Hearing Disputed Terms.  Is that the slide 1,

10:09:26 16 is that what you see, Your Honor?

10:09:28 17           THE COURT:  I do.

10:09:28 18           MR. HELGE:  Perfect.  Thank you, Your Honor.

10:09:30 19 I'll skip to slide 2, term one, the term is avatar and

10:09:33 20 avatars.  It shows up -- I think as Your Honor knows there

10:09:38 21 are only two asserted claims in this case in the '690

10:09:42 22 Patent, claims 4 and 8.  Both of those claims are dependent

10:09:46 23 claims.  They depend from respectively claim 1 and claim 6.

10:09:50 24 Avatar shows up heavily throughout all of the claims.

10:09:55 25           Frankly, Your Honor, and as you see I think in

10:09:55 1    the two counterproposals for construction there is actually

10:10:00 2    a fairly narrow issue in dispute today.  And that's a

10:10:04 3    question of whether the graphical representation of a user

10:10:08 4    must be in three-dimensional form or whether as Defendants

10:10:12 5    propose it can be silent.

10:10:14 6             As Your Honor knows, this term has been

10:10:17 7    presented to both the Massachusetts District Court in a

10:10:20 8    co-pending litigation and Worlds' construction, the

10:10:25 9    Plaintiff's proposed construction was adopted.  I recognize

10:10:27 10   that there was also a proceeding before the PTAB and in the

10:10:31 11   PTAB --

10:10:33 12            THE COURT:  Let me ask your thoughts.  Is the

10:10:36 13   proceeding before the PTAB now part of the intrinsic

10:10:40 14   evidence?

10:10:41 15            MR. HELGE:  Your Honor, I think the way to look

10:10:47 16   at that, I think the simple answer is yes.  And I believe

10:10:51 17   the courts generally have viewed, for example, statements by

10:10:56 18   patent owners before the PTAB as intrinsic evidence or as

10:11:05 19   evidence that then becomes in effect part of the file

10:11:08 20   history.

10:11:08 21            THE COURT:  So then is the PTAB final written

10:11:14 22   decision part of that?

10:11:17 23            MR. HELGE:  Well, Your Honor, I think the

10:11:20 24   question may be the question of whether there is perhaps

10:11:24 25   some estoppel effect or something related to the PTAB's

10:11:30 1    final decision.

10:11:31 2            THE COURT:  No, I don't think it's estoppel

10:11:35 3    effect and everybody agrees that's not binding on me.  I'm

10:11:38 4    just trying to understand where it comes into play.  Is it

10:11:40 5    part of the intrinsic evidence or part of the extrinsic

10:11:43 6    evidence?

10:11:45 7            MR. HELGE:  I see, Your Honor.  I think what

10:11:47 8    most courts have taken a position on that point, Your Honor,

10:11:49 9    is that it would be intrinsic rather than extrinsic.  It was

10:11:55 10   certainly before the PTAB arguments, I know arguments made

10:11:59 11   before the PTAB in IPR's have been looked upon as disclaimer

10:12:03 12   just as it may have been during prosecution history,

10:12:06 13   original prosecution history, Your Honor.

10:12:08 14           THE COURT:  Okay.

10:12:10 15           MR. HELGE:  So, Your Honor, there is a few

10:12:13 16   points that we can make about the PTAB proceeding, but I

10:12:16 17   think the more important thing is that under the *Phillips*

10:12:21 18   interpretation as interpreted by the Massachusetts District

10:12:25 19   Court, Worlds' construction was adopted and we certainly

10:12:27 20   believe that that is more in line with the way --

10:12:30 21           THE COURT:  But didn't the PTAB also use the

10:12:33 22   *Phillips* construction?

10:12:36 23           MR. HELGE:  Your Honor, that's a very good

10:12:38 24   point.  I would say that the PTAB purported to use the

10:12:41 25   *Phillips* construction or the format, the *Phillips* format,

10:12:45 1    although I think when you look at, for example, I believe

10:12:48 2    it's slides 25 and 26 of Linden's presentation, the snippets

10:12:55 3    that they have grabbed from the PTAB's decision really reads

10:12:59 4    more like a broadest reasonable interpretation standard.

10:13:03 5    What they really do was they looked to the term of avatar

10:13:07 6    extrinsically, generally how it was used in the community or

10:13:10 7    how they thought it could have been used in the community

10:13:13 8    and the industry, and then looked to see whether there was

10:13:16 9    any expressed disclaimer in the patent, whether there was a

10:13:20 10   definition lexicography in the patent, and finding none,

10:13:25 11   they adopted in effect what I think would be called the

10:13:28 12   broadest interpretation.

10:13:30 13         Although they purport to use a *Phillips*

10:13:34 14   standard, their mechanisms and the procedures really weren't

10:13:37 15   according to *Phillips*.  A great case I think on point there,

10:13:40 16   Your Honor, and even Linden used this in their brief,

10:13:44 17   although not necessarily in the context of avatars, is the

10:13:47 18   *GPME* case, which the Federal Circuit was saying when a

10:13:52 19   patent specification uses a term consistently throughout,

10:13:57 20   that it's appropriate to construe the term consistent with

10:14:01 21   that disclosure.  And here we have in the '690 Patent a

10:14:05 22   consistent discussion and referral to the avatars as

10:14:12 23   three-dimensional.

10:14:12 24         I think Your Honor has probably already seen the

10:14:16 25   abstract here on slide 3 which does mention this idea of the

10:14:20 1    three-dimensional graphical multiuser interactive virtual

10:14:25 2    world system.  And I think perhaps the more important slide

10:14:29 3    is slide 4 showing Figure 1 which shows the client screen

10:14:34 4    view in the virtual world, we do see what is referred to as

10:14:39 5    avatars, these penguins 18, you can see you're looking at

10:14:43 6    different views of those avatars because orientation in a

10:14:46 7    3-D virtual world is important.

10:14:49 8             Your Honor, I'm going to jump to slide 5.  Here

10:14:52 9    we get into some of the discussions that I think are

10:14:54 10   important for -- and were important to the Massachusetts

10:14:58 11   District Court for construing avatar to be a

10:15:00 12   three-dimensional representation of a user.  We have column

10:15:05 13   3, lines 12 to 18 describing Figure 1 where it's

10:15:08 14   unequivocally stated that each avatar A team is a

10:15:11 15   three-dimensional figure chosen by the user to represent the

10:15:19 16   user in the virtual world.  We have column 6, lines 8 to 11,

10:15:23 17   the avatar images are three-dimensional and look different

10:15:26 18   from most cases from different angles.

10:15:29 19            Now, I think, Your Honor, if you look to the

10:15:31 20   bottom right of the screen here --

10:15:33 21            THE COURT:  But those that you are citing me to

10:15:42 22   on the left side of the page, those are for a particular

10:15:47 23   embodiment; right?

10:15:48 24            MR. HELGE:  I think that's accurate, Your Honor,

10:15:50 25   I'm going to pull up my copy of the patent here.  When we

10:15:53 1   get into column 6, we're not really talking about a specific

10:15:59 2   figure.  I think you know if you look at column 3 and

10:16:03 3   Defendant Linden has certainly pointed out that's Figure 1,

10:16:07 4   it doesn't have to be everything.  But if you look at the

10:16:09 5   patents, I'm looking right now column 3, column 4, there is

10:16:13 6   discussions of Figure 1, Figure 2, Figure 3, Figure 4.  By

10:16:16 7   the time we get to column 6, I think Your Honor is correct

10:16:19 8   that if you were to say well, isn't this just an embodiment,

10:16:23 9   the idea of the remote avatar position table 112, I think

10:16:27 10  Your Honor would be correct to say that it is an embodiment,

10:16:30 11  but I think the important point here is that there actually

10:16:33 12  is no embodiment where avatars are disclosed as simply a

10:16:37 13  single two-dimensional panel.

10:16:40 14          When we get into, for example, in these two

10:16:43 15  snippets that we have on slide 5 on the right-hand side, the

10:16:47 16  lower right is column 6, lines 14 to 17, it's part of the

10:16:53 17  same paragraph as the snippet we just saw to the left,

10:16:56 18  column 6, lines 8 to 11 where we talk about the avatar

10:17:00 19  images are three-dimensional.  I think there is an important

10:17:02 20  point here that maybe Linden doesn't appreciate, and that is

10:17:07 21  that the idea of an avatar image being three-dimensional is

10:17:12 22  a consistent disclosure in this patent and the idea that an

10:17:15 23  avatar image as we say here in 6, 14 to 17, that the avatar

10:17:20 24  image comprises M panels and M panels --

10:17:24 25          THE COURT:  Look, I totally agree with you that

10:17:27 1   avatar images can be three-dimensional.  What I'm struggling

10:17:31 2   with is whether they must be three-dimensional when that is

10:17:34 3   not how they are -- that is not in the language of the

10:17:39 4   claim.  So tell me what your response is to Linden pointing

10:17:48 5   out that in continuation applications, they use the term

10:17:52 6   avatar and three-dimensional avatar, they use both of those

10:17:58 7   terms.  And so if three-dimensional was implicit in the word

10:18:04 8   avatar, then there is no reason to use the alternative.

10:18:10 9   What's your response to that?

10:18:11 10          MR. HELGE:  Absolutely, Your Honor.  I think

10:18:13 11  that's a great point.  I think that was one of the things

10:18:15 12  that the PTAB got hung up on a little bit.  There is an

10:18:20 13  argument I think that Linden is making that is really what

10:18:24 14  Your Honor just mentioned.  It's really based on a claim

10:18:27 15  differentiation argument.  Claim differentiation is

10:18:30 16  obviously as we know strongest when you're talking about --

10:18:34 17          THE COURT:  But I'm not concerned about -- I get

10:18:36 18  it, it's not claim differentiation such that I feel

10:18:39 19  compelled to do it, but it's an interesting argument to me

10:18:42 20  that if it's so clear that avatar means three-dimensional by

10:18:50 21  itself, then why in the world would they have put

10:18:52 22  three-dimensional in different claims?

10:18:58 23          MR. HELGE:  Yes, Your Honor.  It's true I think

10:19:01 24  if we look at the '501 Patent and the '998 Patent, it was

10:19:05 25  explicit.  And I think using that disclosure or that claim

10:19:13 1  language, the three-dimensional avatar in those patents, I

10:19:15 2  think the simplest way to say it, Your Honor may have

10:19:18 3  already hinted at this is that they have made explicit what

10:19:22 4  had already been implicit.  I know, for example, if there is

10:19:22 5  a discussion with the patent examiner and the examiner may

10:19:31 6  say look I'm looking at this from a broadest reasonable

10:19:32 7  interpretation during examination, even though the *Phillips*

10:19:36 8  construction, the correct construction is that avatars are

10:19:39 9  always three-dimensional under BRI, I want you to be more

10:19:43 10 specific.

10:19:43 11         And so, I think the question of what happens

10:19:46 12 during prosecution, the choices made during prosecution in

10:19:50 13 order to -- from an examiner's perspective narrow the scope

10:19:54 14 of that term, and in fact, we know under *Phillips* there

10:20:00 15 actually hasn't been any narrowing at all.  It's not a

10:20:04 16 situation where in the past, or in the earlier applications

10:20:08 17 Worlds was trying to claim only a 3-D and then later on

10:20:14 18 expanding that to 3-D and 2-D, in other words maybe there

10:20:18 19 had been some disclaimer early on and somebody tried to

10:20:22 20 broaden it and somebody said you can't do that.

10:20:25 21         Here with the '501 and the '998, I do think the

10:20:28 22 PTAB got caught up in that and they wouldn't accept the

10:20:32 23 explanation which Judge Casper did accept in Massachusetts

10:20:37 24 was that in effect yes, in the '501 and '998 what was

10:20:40 25 already implicit was simply made explicit.

10:20:43 1          THE COURT:  But it was only made explicit some

10:20:46 2 of the time.  I mean, I would understand your argument more

10:20:48 3 if you said well, we're just going to put 3-D in to all the

10:20:52 4 claims and whatever, if it makes the examiner happy, but

10:20:55 5 that's not what happened.  They put 3-D into some claims and

10:20:59 6 they didn't put 3-D into others.  Right?

10:21:04 7          MR. HELGE:  Your Honor, that's -- you have asked

10:21:08 8 a question that -- I have been working on these cases for a

10:21:11 9 while.  You asked a question that I don't think I have been

10:21:14 10 asked before.  My recollection, and I would like to verify

10:21:16 11 this maybe while Linden is talking, but my recollection is I

10:21:21 12 believe once they got into -- once they got into those

10:21:26 13 patents, my recollection was that they were using

10:21:29 14 three-dimensional fairly consistently in the '501 and the

10:21:34 15 '998.  But again, I would like to double-check that if I

10:21:38 16 may.

10:21:39 17          THE COURT:  Okay.  Go ahead.  I interrupted you.

10:21:43 18          MR. HELGE:  Yes, Your Honor.

10:21:44 19          I think the important part that we have here in

10:21:47 20 the right-hand column of slide 5, we do talk about this idea

10:21:52 21 of the panels, but again, I would just like to maintain that

10:21:56 22 the idea of an avatar image being made up of these multiple

10:22:00 23 panels where M is greater than two, there simply isn't a

10:22:04 24 disclosure in the '690 Patent that an avatar image can be

10:22:06 25 made up of one two-dimensional panel and that is it.  I

10:22:12 1    think that's what Linden is looking for and they haven't

10:22:14 2    found it.

10:22:15 3            Throughout their briefing they haven't pointed

10:22:17 4    to any instance where there is a clear disclosure of a

10:22:21 5    single two-dimensional panel constituting the entirety of an

10:22:25 6    avatar image.  They do lean in that direction a little bit

10:22:29 7    when they start looking at figure 5, although figure 5 is

10:22:32 8    showing the avatar from different views.  Obviously we're

10:22:35 9    limited to some extent because we're printing these images

10:22:39 10   on paper which is inherently two-dimensional, but as you

10:22:43 11   start spinning the avatar you can see you are seeing

10:22:46 12   different dimensions.

10:22:47 13           THE COURT:  Are the avatars that are depicted in

10:22:50 14   the patent three-dimensional?

10:22:52 15           MR. HELGE:  I think they are, Your Honor.  I

10:22:54 16   think that figure 1, figure 5 are showing three-dimensional

10:22:58 17   avatars.  And I think we are know that primarily from column

10:23:02 18   3, lines 12 to 17 as we have here, each avatar 18 is a

10:23:08 19   three-dimensional figure.  I think what Worlds is showing

10:23:10 20   is, in fact, that three-dimensional image.

10:23:17 21           THE COURT:  Okay.

10:23:18 22           MR. HELGE:  So, Your Honor, one other point here

10:23:22 23   as we said, the characterization that Linden has, they have

10:23:27 24   gone to Dr. Rosenberg and they have some discussion from him

10:23:32 25   about whether I think whether Worlds is disclosing what they

10:23:38 1    call 2.5-D versus 3-D in the discussion in column 6 in this

10:23:43 2    discussion of the panels and I think that also shows up in

10:23:45 3    column 7 around lines 36 to 41.  But I think Dr. Rosenberg

10:23:51 4    falls into some of the same trap that the board fell into

10:23:55 5    which is he started with a dictionary definition of avatar

10:24:00 6    and then looked for something in the patent --

10:24:02 7              THE COURT:  Just so I understand, you are not

10:24:04 8    disputing that the plain and ordinary meaning of avatars

10:24:08 9    does not include three-dimensional; is that right?

10:24:12 10             MR. HELGE:  The plain and ordinary -- Your

10:24:14 11   Honor, I think what I would say, Your Honor, I think that

10:24:17 12   when we look at, you know, for example, dictionaries, I

10:24:21 13   don't think the avatar definition has been so specific as to

10:24:24 14   require three-dimensional.

10:24:25 15             THE COURT:  So in the ordinary course in a

10:24:29 16   dictionary defining an avatar doesn't require it to be

10:24:34 17   three-dimensional; right?

10:24:35 18             MR. HELGE:  I think that's right, Your Honor.

10:24:36 19             THE COURT:  Okay.  So that means that you're

10:24:38 20   saying that the patent specification somehow defines the

10:24:44 21   term avatar to require it to be three-dimensional.  Is that

10:24:47 22   the argument that you're making here and you support that

10:24:50 23   with the portions of the specification that you have here on

10:24:52 24   slide 5?

10:24:56 25             MR. HELGE:  Absolutely, Your Honor.  The

10:24:59  1    specifications, and in fact really the entire theme of the

10:25:03  2    patent, Your Honor, is dealing with this idea of a

10:25:05  3    three-dimensional world.  I don't think there is any dispute

10:25:07  4    that the world is always three-dimensional.  And what we

10:25:10  5    will start talking about in the patent and what we're really

10:25:16  6    dealing with is this problem that results from

10:25:19  7    three-dimensional world and three-dimensional avatars which

10:25:21  8    is the volume of data being transmitted and the volume of

10:25:26  9    data that has to be processed by each client is vast,

10:25:31 10    dramatically higher than it would be with viewer avatars, of

10:25:37 11    course, but we also add the dilemma of having an orientation

10:25:42 12    that changes the image of the avatar.

10:25:45 13              And we think under *Phillips*, the correct way to

10:25:49 14    interpret the avatar is to go through the patent and we

10:25:52 15    think the specification is quite clear in the sense that it

10:25:56 16    is talking about both in the problem that it's solving and

10:26:00 17    the disclosures of the avatars that it makes that it is

10:26:03 18    talking about a three-dimensional avatar consistently, so

10:26:06 19    yes, Your Honor, that is the argument we're making.

10:26:09 20              THE COURT:  Okay.

10:26:11 21              MR. HELGE:  And Your Honor, I believe that is it

10:26:14 22    for my slides on avatar.  If you would like ask the

10:26:19 23    Defendant -- however you would like to handle this, Your

10:26:21 24    Honor, we can move on or we can stick with this term.

10:26:24 25              THE COURT:  No, I would like to hear from the

10:26:26 1    Defendant on that.

10:26:27 2                    MR. HELGE:  Okay.  I will stop my sharing of the

10:26:30 3    screen then.

10:26:31 4                    MR. SACKSTEDER:  Good morning, Your Honor.

10:26:33 5                    THE COURT:  Good morning.

10:26:34 6                    MR. SACKSTEDER:  Michael Sacksteder on behalf of

10:26:38 7    Defendant, Linden Research.  I will share my slides if

10:26:42 8    that's okay with you.

10:26:43 9                    THE COURT:  Please.

10:26:45 10                   MR. SACKSTEDER:  Do you have them in front of

10:26:47 11   you?

10:26:48 12                   THE COURT:  I do.

10:26:49 13                   MR. SACKSTEDER:  Unfortunately that is --

10:26:53 14   requires me to look off screen.  I apologize, but I do want

10:26:56 15   to make sure that --

10:26:57 16                   THE COURT:  That's okay.  I can't see your face

10:27:00 17   at the moment, so I'm just looking at the slide.

10:27:02 18                   MR. SACKSTEDER:  That's probably a good thing.

10:27:04 19                   I would like to start, Your Honor, on slide 11

10:27:06 20   which is where one starts in the construing claims and

10:27:12 21   specifically with the actual term that is used in the claims

10:27:16 22   and the language of the claims overall.  And as you can see

10:27:22 23   throughout, the term in this patent is avatar.  It does not

10:27:26 24   have any limitation to being a three-dimensional avatar.

10:27:31 25                   And I think Your Honor got it exactly right in

10:27:37 1    your questioning that the -- we are not arguing that the

10:27:42 2    avatar cannot be a 3-D avatar, what we're saying is that it

10:27:49 3    isn't required to be 3-D.

10:27:51 4            And we think that if we go forward to slide 13,

10:27:58 5    I think that Plaintiff is running afoul of its own

10:28:01 6    complaints about what it says Defendant is doing, which is

10:28:05 7    putting extraneous limitations that are not required or

10:28:09 8    suggested by the language of the claims.

10:28:12 9            THE COURT:  And do you, Mr. Sacksteder, agree

10:28:15 10   that the ordinary meaning of avatar would not require it to

10:28:19 11   be three-dimensional?

10:28:20 12           MR. SACKSTEDER:  I certainly do.

10:28:21 13           THE COURT:  Okay.

10:28:22 14           MR. SACKSTEDER:  I think there is a part of the

10:28:24 15   construction that we agree on which is the representation of

10:28:27 16   the user, a graphical representation of the user, and that

10:28:30 17   there is no requirement in the ordinary meaning as it was

10:28:32 18   used at the time.  And we'll get into that with some

10:28:36 19   discussion of the extrinsic evidence later on, but I think

10:28:39 20   the intrinsic evidence is also clear that there is no

10:28:42 21   requirement that an avatar be 3-D and that a person of

10:28:49 22   ordinary skill reviewing the specification, the claims and

10:28:54 23   the prosecution history would not see any disclaimer of

10:28:59 24   non-3-D --

10:29:00 25           THE COURT:  So that's what I need you to focus

10:29:02 1    on.  I understand the arguments that you're making with

10:29:08 2    respect to the portions of the specification that describe

10:29:13 3    embodiments and they have that disclaimer language that says

10:29:17 4    these are all illustrative, look at the claims, don't limit

10:29:21 5    the claims.  That I understand.  Tell me, though, what your

10:29:25 6    response is to the portion cited.  I think it's the same

10:29:27 7    language in the abstract and summary of the invention where

10:29:30 8    it talks about the present invention which is language that

10:29:34 9    catches my attention more than the embodiment.  Why is that

10:29:41 10   not relevant?

10:29:42 11           MR. SACKSTEDER:  I understand that.  And if I

10:29:46 12   can -- I don't think we have a slide on that, but I'll refer

10:29:49 13   you to I believe it appears in the abstract among other

10:29:52 14   places.  What the abstract and the summary of the invention

10:29:56 15   say is that the world in which this occurs is 3-D.  I think

10:30:01 16   if you look through it, you won't see any requirement that

10:30:04 17   the avatars that appear in that world be three-dimensional.

10:30:09 18   If you look at Figure 1 of the patent on, for instance,

10:30:15 19   slide 20 on the right side, you can see that there is a way

10:30:22 20   to move around that room, to move around the room beyond the

10:30:28 21   penguins that you see in the room.

10:30:32 22           And the way that -- so what that is talking

10:30:36 23   about, though, is the system.  It's talking about the actual

10:30:40 24   world in which this appears.  There is no requirement that

10:30:45 25   the avatars that appear in that world be three-dimensional.

10:30:48  1          In fact, as Dr. Rosenberg explains in detail in

10:30:53  2    his declaration, what is shown in the patent and what is

10:30:57  3    disclosed in the patent is at best 2.5-D.  It is a

10:31:03  4    representation of an avatar where there may be different

10:31:09  5    views as you go around, but they are not true

10:31:13  6    three-dimensional renderings of an item.

10:31:18  7          Looking at slide 21, again, that is in the

10:31:22  8    patent itself.  And going back to slide 19, the description

10:31:29  9    is -- says that you have panels where each one is a

10:31:35 10    two-dimensional description of the avatar.  It shows a

10:31:41 11    different angle that you would see it from, but it doesn't

10:31:44 12    show any kind of a continuous three-dimensional

10:31:47 13    representation.  It says that the number of panels is M, and

10:31:52 14    the number of panels that is used is greater than two which

10:31:58 15    means you can't just have flip sides of one panel.  And then

10:32:04 16    eight is a suitable number.

10:32:06 17          And as Dr. Rosenberg explains in his

10:32:10 18    declaration, what happens --

10:32:11 19          THE COURT:  Let me just stop you and ask you

10:32:14 20    this in terms of the way we have been looking at it here.

10:32:16 21    And that is with these panels, if you assume you have a

10:32:22 22    cube, okay, and each side of the cube has a picture on it,

10:32:27 23    so the front of the cube looking at you would have my face

10:32:32 24    on it, the side would have my -- you know, one side would

10:32:35 25    have my right profile, the other side my left.  The back one

10:32:40 1    would have the back of my head and the top, the top of my

10:32:43 2    head and the bottom looking up at me from below.  Is that an

10:32:46 3    accurate way to think of this?

10:32:50 4            MR. SACKSTEDER:  That's my understanding from

10:32:53 5    Dr. Rosenberg --

10:32:54 6            THE COURT:  So then tell me if you have -- if

10:32:58 7    you have more than two panels being shown, why is that not

10:33:03 8    getting in a three-dimensional image?

10:33:05 9            MR. SACKSTEDER:  It isn't a full

10:33:07 10   three-dimensional rendering of an image.  It doesn't show

10:33:10 11   from each angle exactly what you would see in the real world

10:33:15 12   if you were at that angle, it just shows --

10:33:18 13           THE COURT:  Is that a dispute over what

10:33:20 14   three-dimensional means or is that a dispute over what

10:33:23 15   avatar means?

10:33:24 16           MR. SACKSTEDER:  I think it is what a person of

10:33:27 17   ordinary skill in the art would have understood to be

10:33:31 18   2.5-dimensional rendering at the time according to

10:33:35 19   Dr. Rosenberg, and there is no -- nothing to contest what he

10:33:41 20   says.  And it is not a true three-dimensional rendering.

10:33:46 21   That is a different thing that computer graphics experts do.

10:33:51 22   And this is one where the image changes abruptly.  So we see

10:33:55 23   the image face on, if we're on one side of the cube and it

10:34:00 24   isn't literally a cube, it is just the way it's

10:34:08 25   mathematically represented in the code.  And then you go to

10:34:11 1    another side and you don't see sort of a three-quarters

10:34:15 2    view, you don't see a two-thirds view, you go straight to

10:34:18 3    the side view.  I think that is what is described here.

10:34:23 4              So at best what is described in this embodiment,

10:34:27 5    which is not a limitation on the claim, is not true

10:34:33 6    three-dimensional.  So a person of ordinary skill, and

10:34:36 7    Dr. Rosenberg describes this in great detail and looks at

10:34:40 8    this and understands that it is not limiting the claim to

10:34:43 9    any kind of a three-dimensional avatar.

10:34:46 10             THE COURT:  Okay.

10:34:47 11             MR. SACKSTEDER:  And that's true, you know, in

10:34:49 12   light of -- and I recognize that this is extrinsic evidence,

10:34:52 13   but in light of the way that the term avatar was used

10:34:56 14   generally in the industry and by people of ordinary skill in

10:35:02 15   the art at the time.  The figure, figure 1 shows Worlds

10:35:08 16   Chat.  If you look at what happened in Worlds Chat, you had

10:35:12 17   an avatar gallery where you could select things that were

10:35:15 18   true three-dimensional avatars, but you could also select

10:35:18 19   the two-dimensional avatars that you see, for instance, on

10:35:21 20   the left side of slide 20.  And those are all included in

10:35:27 21   what a person of ordinary skill in the art when looking at

10:35:30 22   things like the avatar gallery in Worlds Chat would

10:35:34 23   understand to be an avatar.  And that is, that is how a

10:35:40 24   person would have understood it as shown, for instance, on

10:35:44 25   figure 5.  Again, that's an illustration of an avatar in

10:35:49 1    slide 21.  And these are at best sides of an image that, or

10:35:58 2    of an avatar that would be shown serially as two-dimensional

10:36:05 3    images.  They would not be true three-dimensional images

10:36:10 4    that would be shown to the user.

10:36:13 5              THE COURT:  Okay.

10:36:17 6              MR. SACKSTEDER:  So going back a little bit, I

10:36:19 7    do want to address the issue regarding the continuation

10:36:22 8    patents because I think that that was -- that is actually a

10:36:26 9    way that the PTAB used and I think that it is the way that

10:36:31 10   should be used to determine whether three-dimensional is

10:36:35 11   part of the construction of the term avatar by itself.

10:36:40 12             And if you look at slide 17, you have two

10:36:44 13   different claims.  They are from the '998 Patent.  Claim 2

10:36:48 14   on the right specifically recites that it is a

10:36:53 15   three-dimensional avatar.  Claim 1 on the left, it says

10:36:58 16   remote user avatars, it doesn't say anything about any

10:37:01 17   requirement for them to be three-dimensional.  And we think

10:37:05 18   that that should be construed consistently throughout the

10:37:10 19   construction of the term avatar in the '690 Patent that

10:37:12 20   there is copious case law that you tend to, at least the

10:37:22 21   presumption is that you provide a consistent construction

10:37:22 22   for a claim term throughout the family of patents.

10:37:31 23             And here you have one place where the further

10:37:35 24   limitation of three-dimensional is added to the term avatar,

10:37:35 25   but it is not added in the claim that immediately precedes

10:37:45 1    it.   I think that again the PTAB correctly focused on.

10:37:51 2           THE COURT:  Tell me your response to the

10:37:55 3    argument that while the PTAB said they were applying

10:38:01 4    *Phillips* standards, they actually were looking at the

10:38:05 5    broadest reasonable interpretation?

10:38:08 6           MR. SACKSTEDER:  I think at some point you have

10:38:09 7    to take the PTAB at its word.  If you look at, I believe

10:38:15 8    it's the top of page 41 of the PTAB's final written

10:38:21 9    decision, it says specifically we turn to our analysis using

10:38:25 10   the *Phillips* standard.

10:38:27 11          THE COURT:  Do you agree -- and I understand

10:38:31 12   that that's what the PTAB said.  Do you think, though, in

10:38:37 13   looking at the analysis what they actually did was look at

10:38:40 14   the broadest reasonable interpretation?

10:38:44 15          MR. SACKSTEDER:  I don't see any indication that

10:38:46 16   it did that.  I think that again and again it said that it's

10:38:51 17   applying the *Phillips* standard.  And again, the arguments

10:38:55 18   are the same that we are raising here to a certain extent.

10:38:59 19   And they, we believe, mandate the construction that does not

10:39:04 20   require the limitation of three-dimensional.  I didn't see

10:39:07 21   anything going through there.  I'm not sure I can prove a

10:39:10 22   negative.  But I didn't see anything in there where they

10:39:15 23   were asserting any particular line of reasoning that would

10:39:22 24   have been consistent with BRI but not with *Phillips*.

10:39:28 25          THE COURT:  Okay.

10:39:30 1           MR. SACKSTEDER:  And, Your Honor, I think that

10:39:37 2    that is our argument for the term avatar.  If Your Honor has

10:39:41 3    any further questions, I'm happy to address them.

10:39:44 4           THE COURT:  No.  Thank you.

10:39:45 5           I'll give Plaintiff just a brief reply, but then

10:39:49 6    I would like to move on to the process term.

10:39:51 7           MR. HELGE:  Thank you, Your Honor.  Just very

10:39:53 8    quickly, I think that the reliance on the Worlds Chat

10:39:57 9    implementation, what was developed back in May 1995 which

10:40:01 10   predated the patent's filing by about six months,

10:40:07 11   preliminarily I think is not relevant to the analysis of

10:40:11 12   what the '690 Patent would teach in terms of -- what an

10:40:16 13   avatar is.

10:40:17 14           And, in fact, watching some of the videos I

10:40:20 15   would invite Your Honor to take a look at them as well.  I

10:40:23 16   think the links are in Dr. Rosenberg's declaration, but what

10:40:30 17   happened is there is a gallery, the user approaches the

10:40:33 18   gallery, the appearance of a character is on a screen.  The

10:40:37 19   user selects, the character then jumps out of the screen and

10:40:40 20   rotates and you see this spinning appearance of a

10:40:44 21   three-dimensional graphical representation of the user to be

10:40:50 22   selected.

10:40:51 23           But I do think that the question should remain

10:40:54 24   with the '690 in the intrinsic evidence which again we

10:40:59 25   maintain it's three-dimensional.  I think Your Honor was on

10:41:02  1    the right point thinking about the those panels.  If you

10:41:06  2    were to take a series of those panels, M panels where M is

10:41:09  3    greater than two, cut them out, tape them together to see

10:41:13  4    what's in there, we are looking at, in fact, a 3-D image.

10:41:16  5            What Dr. Rosenberg talks about with respect to

10:41:19  6    2-D, he's really directly contradicting what the '690 Patent

10:41:24  7    teaches about three-dimensional.

10:41:25  8            I think Your Honor may have been on another good

10:41:27  9    point which it appears to be more of a dispute about what

10:41:31 10    three-dimensional is than what is being taught in the patent

10:41:34 11    because in column 6, this entire discussion of panels is

10:41:37 12    referred to as three-dimensional, column 6 at line 10.

10:41:41 13            And I think at that point -- Your Honor, one

10:41:43 14    other question that I didn't answer goes back to the '998

10:41:48 15    Patent.  And Mr. Sacksteder is correct that, in fact, there

10:41:51 16    was this language in claim 2 that talks about each user

10:41:55 17    being associated with a three-dimensional avatar.  We

10:41:57 18    maintain that what's being recited in claim 1 would be

10:42:02 19    avatar, claim 2 of the '998, the '690, consistently again

10:42:07 20    with the specifications referring to the avatars as 3-D

10:42:09 21    there is, in fact --

10:42:10 22            THE COURT:  What about the '998 Patent, though,

10:42:13 23    where claim 1 says avatar, and claim 2 says

10:42:17 24    three-dimensional avatar?

10:42:18 25            MR. HELGE:  Correct, Your Honor.  So Your Honor,

10:42:20  1    I think again here we're looking at an idea where there are

10:42:23  2    a lot of differences in these claims.  As we go through,

10:42:27  3    claim 1 is a method, claim 2 is a system.  If I look at here

10:42:37  4    claim 1 we're actually looking at about portions of virtual

10:42:42  5    environment from a perspective, it allows the local user --

10:42:47  6    what we're really talking about I think is a different

10:42:49  7    concept with this method than we are talking about a system.

10:42:53  8          We would maintain that although it does say

10:42:56  9    three-dimension in that data base element of claim 2 that

10:43:00 10    that's really saying the same thing as avatar.  I think we

10:43:03 11    recognize that it may be redundant, unnecessary to say, but

10:43:08 12    it's simply -- it's not an attempt to broaden, it's just an

10:43:12 13    attempt to clarify, we think.

10:43:15 14          THE COURT:  Okay.  Were either the District of

10:43:19 15    Massachusetts opinion or the PTAB final written decision

10:43:23 16    appealed?

10:43:24 17          MR. HELGE:  Your Honor, the District of

10:43:28 18    Massachusetts claim construction order, honestly I think

10:43:31 19    that order came out in 2015.  That case is ongoing.  It had

10:43:35 20    been stayed pending the IPR's.  Your Honor may know that

10:43:39 21    claims 4, 8, 13 and 16 from the '998 Patent came out

10:43:42 22    successfully from that case.

10:43:45 23          The final written decision was not appealed,

10:43:48 24    although I think, Your Honor, when we look at the decision,

10:43:50 25    really the construction of avatar was not essential to that

10:43:54 1    outcome.   There were a variety of different references in

10:43:58 2    that case, some had 2-D, some had 3-D, what the PTAB

10:44:03 3    referred to as avatars, but the claims 4 and 8 came out, you

10:44:07 4    know, they successfully survived all those challenges.   So

10:44:10 5    there was no appeal.

10:44:12 6              THE COURT:   All right.   Let's move to the next

10:44:14 7    one.

10:44:14 8              MR. SACKSTEDER:   Your Honor, Michael Sacksteder.

10:44:17 9    Could I address just a couple of things that counsel --

10:44:20 10             THE COURT:   Nope, we're done.   Let's go to the

10:44:23 11   next one.

10:44:23 12             MR. SACKSTEDER:   All right.

10:44:24 13             MR. HELGE:   Your Honor, I will once again share

10:44:29 14   my screen for disputed terms.   And I hope Your Honor can see

10:44:36 15   this here.

10:44:37 16             THE COURT:   Yes, I can.

10:44:38 17             MR. HELGE:   Very good.

10:44:39 18             Your Honor, once again we have -- I know that

10:44:42 19   the last term we wound up disputing quite a bit even though

10:44:46 20   it seemed like there was a fairly narrow range of disputes.

10:44:50 21   Here we have a set of terms, client process I'll focus on

10:44:52 22   according to Your Honor's construction, where we have a

10:44:56 23   dispute whether the program can be simply executed stored or

10:45:02 24   --

10:45:02 25             THE COURT:   Here is my question on this one.   I

10:45:04 1     got to tell you, I don't really understand the dispute.

10:45:07 2     Because I don't know what -- you say that it's a program

10:45:14 3     capable of being executed.  They say it's being executed.

10:45:18 4     Tell me what the difference is.  And then you defined

10:45:23 5     capable of being executed as stored or accessible.  I don't

10:45:28 6     know if your position is that that thing never ever in the

10:45:33 7     method has to be executed or if your position is it just

10:45:37 8     doesn't have to be executed for the entirety of the process.

10:45:42 9              MR. HELGE:  I think the latter point is exactly

10:45:44 10    correct, Your Honor.  I think claim 10 --

10:45:47 11             THE COURT:  So do you dispute that the process

10:45:50 12    must be executed at some point?

10:45:55 13             MR. HELGE:  Your Honor, we don't dispute at all

10:45:57 14    that claims 4 and 8 recite methods and that those methods,

10:46:01 15    you're a hundred percent correct, Your Honor, those methods

10:46:04 16    must be performed.

10:46:06 17             THE COURT:  Well, I get it.  Wait, wait, wait.

10:46:09 18    Those methods must be performed, no kidding, that's the

10:46:12 19    whole infringement analysis.  My question is in performing

10:46:15 20    those methods, do you agree that at some point the client

10:46:21 21    process and the server process are executed?

10:46:26 22             MR. HELGE:  Yes, Your Honor, I think that's

10:46:28 23    correct that at some point they will be executed.

10:46:30 24             THE COURT:  And is the real dispute here that

10:46:33 25    the Defendants are saying they have to be executed at all

10:46:36  1   times and throughout the methods?

10:46:41  2              MR. HELGE:  Yes, Your Honor, I think that's part

10:46:43  3   of the dispute.  Certainly, when we look at claim 10, for

10:46:47  4   example, we have in this language, and I can pull up the

10:46:50  5   slide, Your Honor, if you would like, in slide 8 we do have

10:46:54  6   the client process and we have the server process.  And a

10:46:57  7   lot of these claims the client process and server process

10:46:59  8   are introduced in the preamble and they aren't expressly

10:47:04  9   tied to the methods.

10:47:06 10              For example in claim 1, the steps A and B, the

10:47:10 11   claimed method steps are performed by the client process.

10:47:14 12   So the question of when the server process is being executed

10:47:16 13   relative to when those steps are being performed, clearly we

10:47:18 14   don't think is a relevant analysis.

10:47:22 15              THE COURT:  So all you think for claim 1, that

10:47:24 16   claim 1 requires is that at some point there was a

10:47:28 17   communication between the server process and the client

10:47:31 18   process where the client process got the information that's

10:47:36 19   necessary.  Is that right?

10:47:38 20              MR. HELGE:  Correct, Your Honor.  Yes.

10:47:39 21              THE COURT:  And you're saying but nothing in

10:47:41 22   that claim requires that the server process continue to be

10:47:46 23   executing while the other steps are going on, the specific

10:47:51 24   steps in claim 1; right?

10:47:52 25              MR. HELGE:  That's correct, Your Honor, we don't

10:47:54 1    think that there has to be a concurrent executing of

10:47:58 2    everything at all times.  Correct.

10:47:59 3           THE COURT:  Got it.  I just wanted to make sure

10:48:02 4    I understood the dispute because I wasn't sure that we did

10:48:05 5    based on the papers.

10:48:06 6           MR. HELGE:  Understood.  And I think Your Honor

10:48:09 7    is a hundred percent on point here.  Again, claim 10, and

10:48:13 8    again, really I'll stick with claims 4 and 8 for a moment

10:48:16 9    here, claims 4 and 8 of method claims, we a hundred percent

10:48:20 10   agree that those, as Your Honor noted, those steps have to

10:48:24 11   be performed.  Same thing with claims 1 and 6.  But in terms

10:48:29 12   of claim 10 where it's a system claim rather than a method

10:48:34 13   claim, here we have the client process, the client process

10:48:37 14   has to be operable.  The server process has to be operable.

10:48:43 15   We interpret that as the processes are programs, they have

10:48:46 16   to be operable.  They have to be able to be accessed and

10:48:51 17   executed --

10:48:52 18          THE COURT:  It seems like from the two

10:48:54 19   constructions that everybody agrees that it's a program;

10:48:56 20   right?

10:48:57 21          MR. HELGE:  Hundred percent correct, Your Honor,

10:48:59 22   yes.

10:49:00 23          THE COURT:  And for you, would you be okay with

10:49:02 24   a construction that is a program executed, so for example, a

10:49:12 25   client process would be a program executed on a user's

10:49:17  1    computer to provide access to a server rather than being

10:49:21  2    executed such that if we clarified it doesn't need to be

10:49:25  3    continuously running, would that construction work for the

10:49:29  4    Plaintiff?

10:49:30  5               MR. HELGE:  Your Honor, I think that is -- yes,

10:49:35  6    that would resolve our dispute with the Defendant's

10:49:40  7    requirement of an active execution.  And I would only note

10:49:43  8    that I think we are a little concerned, maybe unnecessarily,

10:49:49  9    we're a little concerned about saying that we agree to a

10:49:52 10    construction other than what was argued in Massachusetts

10:49:54 11    where that case is not yet complete.  I think that's why we

10:49:58 12    presented --

10:49:59 13               THE COURT:  I understand.  But I'm just asking

10:50:01 14    you, and you can tell the judge in Massachusetts truthfully

10:50:05 15    that we were agreeing to this under duress from, or pressure

10:50:11 16    from the district court because I'm trying to understand, is

10:50:15 17    that really what you're trying -- because I don't understand

10:50:18 18    where the stored or accessible comes into play.  If it's

10:50:23 19    something that is only stored or only accessible and it's

10:50:26 20    never used, I don't think that that falls within.  So I'm

10:50:30 21    trying to understand what the real crux of this is.  It

10:50:33 22    seems to me it must be executed, though when it's executed

10:50:37 23    is not part of at least claim 1.  Right?  That's your

10:50:41 24    position?

10:50:42 25               MR. HELGE:  Yes, Your Honor, I think that's

10:50:51 1   correct.  I was just thinking about whether there is maybe a

10:50:57 2   different alternative.  But I think Your Honor's point is

10:51:01 3   correct, a program that has been executed and is stored and

10:51:05 4   able to be executed, I think the idea is --

10:51:08 5              THE COURT:  No, I'm not agreeing with you on

10:51:10 6   stored or accessible, because if it's something that is

10:51:14 7   stored and never ever, ever executed, would you say that

10:51:19 8   that falls within your construction?

10:51:20 9              MR. HELGE:  I think it would be really hard to

10:51:22 10  run a virtual world --

10:51:25 11             THE COURT:  But is that covered in your

10:51:27 12  construction, which is stored or accessible or executed?

10:51:35 13             MR. HELGE:  Well --

10:51:36 14             THE COURT:  Your construction as I read it does

10:51:39 15  not require the program ever to be executed.  And I don't

10:51:44 16  think that that's consistent with the claim language.

10:51:46 17             MR. HELGE:  I understand, Your Honor.  I think

10:51:48 18  that maybe -- I apologize if I'm talking past you a little

10:51:54 19  bit.  I think the answer to that would be in terms of the

10:51:56 20  preamble, the way the preamble recites client process and

10:52:01 21  sever process in claim 1, there is a requirement for active

10:52:05 22  execution in order to meet that preamble, certainly when the

10:52:08 23  claimed method steps are being performed, that is a result

10:52:11 24  of executed code.  I don't think there is any dispute there.

10:52:14 25  And there is simply if you look at steps A and B of claim 1,

10:52:21 1    the patent makes clear that those are being performed by the

10:52:24 2    client process, so you know the question is do we need to

10:52:28 3    show that the server code is currently being executed during

10:52:31 4    that time, no.  Will the server process be a program that is

10:52:37 5    executed in order to run the virtual world, yes, I think

10:52:41 6    that's right.

10:52:42 7             Does that answer Your Honor's question?

10:52:44 8             THE COURT:  I think I understand what your

10:52:46 9    position is on that.  Let me hear from Defendant as to what

10:52:55 10   is your support for saying it must be continually running?

10:53:01 11   Is that really what your position is that these things must

10:53:07 12   be -- must be executed throughout the entire method?

10:53:12 13            MR. SACKSTEDER:  Your Honor, I don't believe we

10:53:14 14   are saying that.

10:53:14 15            THE COURT:  Okay.

10:53:16 16            MR. SACKSTEDER:  Our concern -- and if I may

10:53:19 17   share my screen.  Our concern is with I think the

10:53:25 18   disjunctive nature of Plaintiff's proposed construction

10:53:30 19   where the --

10:53:32 20            THE COURT:  Right.  But would you be amenable to

10:53:34 21   a construction that says a program executed for client

10:53:39 22   process, a program executed on a user's computer to provide

10:53:42 23   access to a server with the clarification that the program

10:53:46 24   may not be running the entire time?

10:53:49 25            MR. SACKSTEDER:  I'm not sure that clarification

10:53:51 1   is even necessary, but I think that the construction would

10:53:56 2   certainly be acceptable.  I think that the definition of

10:54:03 3   process, if you look at slide 31 from the Dictionary of

10:54:10 4   Computer Graphics and Virtual Reality contemporaneous with

10:54:15 5   application for filing, actually does say a program while

10:54:18 6   being executed.  But I think that that is captured by the

10:54:22 7   construction that would just say a program executed by a

10:54:26 8   user's computer for client process or --

10:54:30 9           THE COURT:  Let me ask Plaintiff.  Aside from

10:54:35 10   your queasiness at agreeing to something, you're not

10:54:39 11   proposing it, you're just agreeing to something that is a

10:54:44 12   little bit different from what the Massachusetts court said,

10:54:49 13   is that acceptable to you that we construe client process to

10:54:54 14   be a program executed on a user's computer to provide access

10:54:58 15   to a server?

10:54:59 16           MR. HELGE:  Yes, Your Honor.

10:55:00 17           THE COURT:  Okay.  So it seems like we have an

10:55:02 18   agreement on that.

10:55:03 19           So let's go to the server process.  And let me

10:55:09 20   ask the same question, for a server process it seems like

10:55:12 21   there is a lot of agreement, and what if we were to construe

10:55:18 22   that as a program executed by one or more computers that

10:55:22 23   provide one or more services to users of computers across a

10:55:29 24   network.  Would that be acceptable to the Plaintiffs?

10:55:35 25           MR. HELGE:  Yes, Your Honor.

10:55:35 1                    THE COURT:  And what about the Defendants?

10:55:37 2                    MR. SACKSTEDER:  It would, Your Honor.

10:55:38 3                    THE COURT:  Okay.  So we have agreement on that.

10:55:40 4               So let's move to the fourth term which is "the

10:55:44 5     receiving a position of less than all of the other users'

10:55:52 6     avatars."  And for some reason that one is hard for me to

10:55:56 7     say.  But I think I understand the issues.

10:55:58 8                    Let's hear from Plaintiff.

10:56:00 9                    MR. HELGE:  Thank you, Your Honor.  Once again I

10:56:02 10    will share my screen here.

10:56:03 11                   Your Honor, I'm moving to slide 9.  Can you see

10:56:16 12    that?

10:56:16 13                   THE COURT:  Yes.

10:56:19 14                   MR. HELGE:  I think, Your Honor, this term

10:56:20 15    raises I think a very important point regarding claim

10:56:23 16    construction.  The purpose of claim construction is not

10:56:26 17    simply to rewrite the claims in a way that one party or the

10:56:29 18    other wants to rewrite them, but rather here I think what we

10:56:34 19    see is Linden has tried to do this in a fairly imperfect

10:56:39 20    way.  I'm going to move to slide 10, Your Honor.  There is

10:56:42 21    two points on slide 10 highlighted in their proposed

10:56:46 22    construction.  The red highlighted language incorporates a

10:56:50 23    -- what they call a set maximum number N of the other users'

10:56:55 24    avatars, and the gray language there, nearest to the users'

10:56:59 25    avatars imposes a proximity limitation to this term in ways

10:57:05 1    that are not originally claimed in the claim.

10:57:08 2             So I'm going to move to slide 11 and focus on

10:57:12 3    first what I call the imperfect rewriting of this term.  I

10:57:17 4    think what Linden has done is actually -- intentionally or

10:57:22 5    unintentionally, they have actually created a scenario where

10:57:25 6    the language of the claim itself can be violated.  I'm going

10:57:29 7    to give Your Honor a very quick hypothetical.  We often

10:57:33 8    assume that this idea of less than the total number of other

10:57:36 9    users' avatars is going to be somehow larger than the

10:57:40 10   maximum number N, but it's not required even in Linden's

10:57:44 11   proposed construction.  So we have a situation where if the

10:57:48 12   maximum number, for example, were forty, and the total

10:57:52 13   number of avatars that are in the World at this time, maybe

10:57:55 14   it's a quiet time, there is only twenty avatars in the World

10:58:02 15   at the time.  Under Linden's construction, the client would

10:58:06 16   be receiving position data, it says for up to a set maximum

10:58:12 17   number N, we would say forty of other users' avatars which

10:58:17 18   is less than the total number.  In truth in this scenario

10:58:20 19   that I have given you, forty is actually greater than the

10:58:22 20   twenty, so under this proposed construction, the client

10:58:22 21   would actually receive position data for all of the other

10:58:22 22   users' avatars, all twenty.  But that violates the claim

10:58:32 23   language because the claim requires a receiving a position

10:58:36 24   of less than all, so where we have -- if we define all to be

10:58:40 25   twenty, you can't receive more than nineteen, and yet their

proposed construction would allow that.  I think that is one
way they violated through rewriting it, violated the actual
language of the claim.

          The other situation referring -- I'm looking at
slide 12 now, Your Honor.  The other situation deals with
this idea of proximity.  They imposed a proximity
requirement.  What we see here in these three snippets that
I have provided on slide 12 is that -- and I think you see
it most clearly at the bottom of the right column, those
avatars that are thus neighboring, which means the client 60
will display them.  So the idea that neighboring isn't
really driven by proximity necessarily, it's about what is
going to be displayed.  And we see here in column 5, lines
59 to 60 in the left column, we see the definition of
neighboring might be controlled by other factors besides
proximity.  There is the discussion of user I.D., and other
ways to not necessarily show those avatars simply based on
proximity.  I think the example, Your Honor, if you were
having a conversation with a colleague in the hallway and
maybe if you're standing on different sides of the hallway
and someone were to walk through between you, rudely walking
between the conversation rather than around it, the idea is
under this scenario there would be a jump from the person
you're having the conversation with to the rude intruder
here.  And that's certainly not what's intended with this

11:00:12 1    idea of neighboring where it can include more than

11:00:16 2    proximity.

11:00:16 3              So we think that Linden's proposed construction

11:00:20 4    really violates both the specification through the proximity

11:00:24 5    edition and the claim language through the maximum number in

11:00:28 6    the way that they have rewritten it.

11:00:30 7              THE COURT:  Okay.  Let me hear from Defendant.

11:00:34 8    It seems like you're trying to read a little bit into this

11:00:37 9    claim term, so why is that appropriate?

11:00:40 10             MR. SACKSTEDER:  I understand, Your Honor.  And

11:00:43 11   I think that first I don't quite understand the purported

11:00:50 12   inconsistency within the claim.  And I don't see any

11:01:01 13   consistency between having a maximum number and having that

11:01:04 14   be less than the total number of the other users' avatars.

11:01:08 15   I don't think it can be more.  And perhaps I don't

11:01:13 16   understand that argument.

11:01:15 17             With regard to the proximity, that is the -- and

11:01:19 18   looking at slide 41, the whole idea is crowd control, to

11:01:23 19   keep from having too many avatars around a user.  And to us

11:01:30 20   it seems that that should be something that is included in

11:01:34 21   the requirements of the claims because the whole point of

11:01:42 22   this is keeping from having -- being overwhelmed by too many

11:01:48 23   avatars that are nearby.  I'm not saying that you couldn't

11:01:51 24   use other criteria as well, but it seems that this has to be

11:01:55 25   a criteria because of the overall purpose of the invention.

11:02:01 1              THE COURT:  All right.  Tell me specifically

11:02:03 2    everything that you're relying on for you to do that.

11:02:08 3              MR. SACKSTEDER:  Sure.  We cite on slide 41,

11:02:12 4    column 5, 29 to 54, it's talking about the purpose.  And

11:02:17 5    then talking about the purpose of crowd control.  And

11:02:21 6    avoiding that the user --

11:02:26 7              THE COURT:  So under your construction, are you

11:02:28 8    saying that proximity is the only criterion?

11:02:34 9              MR. SACKSTEDER:  No, Your Honor, just that it is

11:02:36 10   a required criterion.

11:02:41 11             THE COURT:  And why is it required?  Given the

11:02:44 12   language that says neighboring is not only proximity, it can

11:02:48 13   be these other things, where do we get that it must be in

11:02:52 14   there?

11:02:55 15             MR. SACKSTEDER:  Well, looking at slide 42, the

11:03:00 16   process of notifying client of only the N neighbors is

11:03:07 17   handled as part of crowd control, and the overall purpose of

11:03:11 18   the invention is controlling crowds around the user.  And

11:03:17 19   the process of doing that is by notifying them of that N

11:03:20 20   number through what the server sends to the client.

11:03:27 21             THE COURT:  Okay.  Anything else?

11:03:33 22             MR. SACKSTEDER:  No, Your Honor.

11:03:36 23             THE COURT:  Okay.  Mr. Helge, any response?

11:03:42 24             MR. HELGE:  Your Honor, I don't think I have any

11:03:42 25   response, other than I understand that counsel was a little

11:03:46 1    bit confused by my narrative.  I want to make sure that Your

11:03:50 2    Honor understands the way in which they're rewriting the

11:03:54 3    claim term actually could result in a situation where all is

11:04:00 4    fewer than the maximum number.  They have turned the which

11:04:04 5    is all into a clause that doesn't really add any meaningful

11:04:07 6    limitations where you do have, you know, an all number that

11:04:11 7    is less than N, for example.

11:04:13 8             THE COURT:  Okay.  Let's move to the next term.

11:04:17 9    And for these, in the slides it looked like Plaintiff

11:04:23 10   grouped them altogether, and I think I'm okay with grouping

11:04:27 11   the determining claims together, though if Defendant wants

11:04:29 12   to try to separate those out, that's fine.

11:04:32 13            But the last, the comparing term I have more of

11:04:35 14   a problem with, so I want to hear on that one separately.

11:04:38 15   Let's do the determining terms first.

11:04:42 16            MR. HELGE:  Okay.  Your Honor, once again, I'm

11:04:45 17   going to share my slide here.  Your Honor, I'm moving ahead

11:04:57 18   to -- I'm on slide 14.  Yes, you're correct, Your Honor, we

11:05:02 19   do have all three, the two determining steps and then the

11:05:06 20   comparing step lumped together in here.  I think Your Honor

11:05:10 21   may have noticed that in effect they have identified the

11:05:12 22   three steps of claim 4, and also the three steps of claim 8

11:05:16 23   for all the indefinites.

11:05:19 24            In terms of the determining, Your Honor, I can

11:05:22 25   deal with that first.  The specification is pretty clear in

11:05:26 1    the context of how a client can determine what is being sent

11:05:33 2    to it.  It's going to receive as we have on here on the

11:05:37 3    left, column 3, lines 29 to 34, we have the client machine

11:05:40 4    is going to receive updated positioning information for the

11:05:44 5    other clients.  And then it stores it, and as we talk about

11:05:47 6    in column 7, lines 42 to 49, it's storing these positions in

11:05:51 7    the remote avatar position table 112.

11:05:54 8          So in effect in terms of this very first

11:05:58 9    determining step, Your Honor, the determining from the

11:06:00 10   received positions an actual number of the other users'

11:06:04 11   avatars, the client is going to have a table storing the

11:06:07 12   data that it receives and if that table has a certain number

11:06:10 13   of entries, that's something that's very simple for the

11:06:13 14   client to go through and count.

11:06:17 15         If we look at claim 1, for example, when we're

11:06:21 16   talking about claim 4, claim 1, we're looking at -- I'm

11:06:25 17   looking at step B which is determining from the received

11:06:28 18   positions a set of the other users' avatars that are to be

11:06:34 19   displayed to the first user.  Now that step B is what is

11:06:37 20   being described more fully in claim 4.  For example, we say

11:06:41 21   the method of claim 1 wherein step 1(b) comprises and then

11:06:42 22   it gets into this idea.

11:06:48 23         This is the really the process of the client

11:06:50 24   determining what is to be displayed and going to the table

11:06:55 25   and we'll have a certain number of entries and we have

11:06:56  1    actual number of other users' avatars, so the number of

11:07:00  2    entries that would be displayed we think it's fairly simply

11:07:05  3    understood as being that process of determining from the

11:07:07  4    received positions an actual number of the other users'

11:07:10  5    avatars.

11:07:11  6                    THE COURT:  Okay.  Mr. Sacksteder?

11:07:17  7                    MR. SACKSTEDER:  Thank you, Your Honor.

11:07:18  8                    THE COURT:  Let's try the first two.

11:07:21  9                    MR. SACKSTEDER:  Sure.  Thank you, Your Honor.

11:07:24 10            I do agree with Your Honor that the most

11:07:26 11    problematic of these is the comparing step, but we have

11:07:32 12    explained in our briefing and in Dr. Rosenberg's declaration

11:07:36 13    that it's also just not clear what it means by the actual

11:07:40 14    number, it's not clear what it means by the maximum number,

11:07:43 15    not just how it's calculated, but what it means.  And so

11:07:49 16    when one is later asked to compare these two numbers, it

11:07:54 17    isn't clear what numbers the person of ordinary skill in the

11:07:59 18    art would be determining what it could or could not compare

11:08:03 19    them in what would be later on an accused system.  And

11:08:07 20    that's basically the problem, just that there isn't any

11:08:10 21    specific, particularly for actual numbers, there just isn't

11:08:14 22    any specific mention of the number, the actual number of

11:08:20 23    avatars that are not associated with a client process.  And

11:08:25 24    we just think that a person of ordinary skill in the art

11:08:28 25    wouldn't know what those meant.  But as Your Honor

11:08:32 1    mentioned, the big problem comes with the next step.

11:08:35 2            THE COURT:  Okay.  Let's move to that next step.

11:08:39 3    Mr. Helge, tell me, where I'm having an issue on this one is

11:08:51 4    you compare two numbers and it says based on that

11:08:59 5    comparison, you determine which of the avatars are to be

11:09:05 6    displayed, not how many, but which ones.  And where in the

11:09:12 7    patent or the claims is that made clear?  I mean, in your

11:09:18 8    example that you gave me earlier where I was talking to

11:09:21 9    someone in the hall and someone walks by, where is there

11:09:26 10   anything that tells me who gets displayed to me?  Is it just

11:09:33 11   the person who I'm talking to?  Is it the person who is

11:09:38 12   walking by who is closer to me?  How is that done and how is

11:09:43 13   that explained how that is done in the patent?

11:09:47 14           MR. HELGE:  Certainly, Your Honor.  So I think I

11:09:50 15   have slide 17.  Perhaps Your Honor can see it.  We are

11:09:53 16   talking very explicitly in the specification about this

11:09:57 17   concept of N and N prime.  And it is made clear that there

11:10:01 18   is a variable N prime.  I'm looking at also column 5, lines

11:10:08 19   38 to about 40 where we talk about N prime being the maximum

11:10:12 20   number of avatars client 61 seen here.

11:10:16 21           Your Honor, we think this really comes back from

11:10:19 22   this idea that in a 3-D virtual world where avatars are also

11:10:24 23   three-dimensional, and the orientation is important and

11:10:26 24   position is important, that when this data gets sent the

11:10:29 25   client needs -- and the clients who may have a variety of

11:10:33 1    different capabilities of machines, in the mid 1990s you

11:10:37 2    could have had 286's, 386's, 486's, Pentiums, a variety of

11:10:42 3    different capabilities, probably even more so than we see

11:10:45 4    today in terms of maybe a span from worse to best, but I

11:10:50 5    think the comparison idea, I think it follows really from

11:10:53 6    this idea that you're going to determine as part of again

11:10:56 7    claim 1, step B, you're going to determine what to be

11:11:00 8    displayed.  And as part of that determination in claim 4,

11:11:04 9    there is going to be an evaluation of which of the other

11:11:08 10   users' avatars are to be displayed based on an actual

11:11:12 11   number, based on the positions you have received from the

11:11:14 12   server, which ones are going to show up on our screen.

11:11:18 13   There is also this idea of --

11:11:20 14            THE COURT:  Wait.  I don't understand, you're

11:11:22 15   comparing two numbers.  It says comparing the actual number

11:11:26 16   to the maximum number, not to determine how many are going

11:11:31 17   to be displayed, but to determine which of them is going to

11:11:36 18   be displayed.  How is it that comparing numbers tells you

11:11:41 19   which, and where is that explained?

11:11:42 20            MR. HELGE:  I see, Your Honor.  So Your Honor,

11:11:42 21   there are discussions in the patent, and I think the

11:11:50 22   important point to make here is that there are different

11:11:52 23   ways that that could be done.  For example, it could be

11:11:56 24   based on proximity.  It could be based on user I.D.  We do

11:12:02 25   talk about at the bottom of column 5, and I think --

11:12:05 1                    THE COURT:  But where is that done?  How does

11:12:09 2     that fit into comparing a number?

11:12:16 3                    MR. HELGE:  So, Your Honor, I think the answer

11:12:21 4     is simply that if the user's client process is looking at --

11:12:31 5     again, from the patent, the remote avatar position

11:12:35 6     table 112, the server has perhaps sent thirty avatar

11:12:40 7     positions and the client would understand based on the

11:12:43 8     table, there are thirty positions that I have received and I

11:12:46 9     have to determine what to display, because step 1(b) is

11:12:49 10    about determining what to display, but there could be a

11:12:53 11    maximum number setting, it could be a maximum number of ten.

11:12:57 12    Comparing the actual numbers to the maximum number says I'm

11:13:01 13    going to determine which of the avatars to be displayed,

11:13:04 14    where I have thirty actual positions, a max number of ten

11:13:08 15    avatars.  I think we know that there is only going to be ten

11:13:12 16    other avatars to be displayed.  Those ten could be

11:13:16 17    proximity, which we see at the bottom of column 5.  It could

11:13:20 18    be a proximity test, but it also could be that there has

11:13:23 19    been a choice made by this user, I do not want to see

11:13:26 20    avatars 6 through 10, so the ten, when we're counting 1, 2,

11:13:32 21    3, 4, 5, we skip 6 through 10 and we move 11 through 15, if

11:13:37 22    it's going to be based on proximity excluding certain closer

11:13:41 23    users based on user's I.D. and name.

11:13:42 24                    We do see that a little bit in our slide 17 here

11:13:42 25    where you can see some mention of user's I.D. and name as a

11:13:54 1   way of excluding certain avatars from that computation.

11:13:58 2   That question really gets into the breadth of the

11:14:01 3   determination of which.  It could be based on proximity.  It

11:14:05 4   could be based on user I.D.  All those things are taught in

11:14:09 5   the specification.  I disagree that a POSITA would be

11:14:12 6   confused by recognizing that there are different ways,

11:14:16 7   again, especially if taught in the '690 Patent --

11:14:20 8              THE COURT:  I think the reason that someone

11:14:21 9   might be confused is because you're just not -- you're not

11:14:26 10  grappling with the language there.  I'm saying how do you

11:14:30 11  compare two numbers?  And you're saying look at proximity.

11:14:34 12  Well, I don't understand how comparing two numbers means

11:14:38 13  look at proximity.

11:14:40 14             MR. HELGE:  I see.  So, Your Honor, just as a

11:14:42 15  quick point, again, the numbers by themselves are maybe

11:14:48 16  viewed a little bit in isolation.  The numbers aren't really

11:14:53 17  just raw numbers as we know from the determining steps of

11:14:55 18  4(b)(1) and (b)(2) here, we know that the numbers aren't raw

11:15:00 19  numbers, they're actually numbers of other avatars, so it's

11:15:02 20  positions, it's comparing positions, it's comparing the max

11:15:06 21  number that can be displayed and saying based on the data I

11:15:10 22  have gotten from the server, I have gotten thirty, my

11:15:15 23  maximum number to be displayed is ten.  And then the

11:15:20 24  question of which ten to pick I think is left -- I

11:15:22 25  understand what you're saying, Your Honor, which is that

11:15:26 1    comparing thirty to ten doesn't tell you which, but the

11:15:29 2    patent teaches a variety of different ways that those ten

11:15:33 3    can be selected, again, based on proximity, user I.D., other

11:15:37 4    factors, I think that is what's teaching the POSITA this is

11:15:46 5    how you, again, in claim 1(b), this is how you determine

11:15:49 6    what is to be displayed, you have a table, you have numbers

11:15:51 7    and you can see I have thirty avatars on this table, I'm not

11:15:55 8    going to display them all, I'm only going to display a max

11:15:59 9    number of ten.

11:16:01 10                THE COURT:  Okay.

11:16:06 11                MR. SACKSTEDER:  Your Honor?

11:16:10 12                THE COURT:  Mr. Sacksteder, go ahead.

11:16:12 13                MR. SACKSTEDER:  Thank you.

11:16:13 14                THE COURT:  So explain to me based on what we

11:16:16 15   just heard, if comparing numbers doesn't just mean

11:16:23 16   comparing, you know, eight and ten, it means comparing eight

11:16:29 17   with all the information about those eight and ten with all

11:16:35 18   the information about that, and you use that other

11:16:38 19   information to determine which ones you're going to show,

11:16:41 20   why isn't that some reasonable certainty for a person of

11:16:52 21   ordinary skill in the art?

11:16:55 22                MR. SACKSTEDER:  Because that's not what the

11:16:57 23   claim says, Your Honor.  It says determining this maybe gets

11:17:02 24   us back to the problem what actual number means and what

11:17:05 25   maximum number.  It sounds like now we're saying or at least

11:17:10 1    Plaintiff is saying that actual number and maximum number

11:17:13 2    include the position data.  And it doesn't really say that

11:17:17 3    in the claim.

11:17:19 4           I think Your Honor was correct that the word

11:17:22 5    number in the claim means a number of avatars.  It does not

11:17:28 6    include additional information, and if Plaintiff is trying

11:17:33 7    to now get that into the construction, that's part of the

11:17:36 8    problem with the terms actual and maximal numbers.  I think

11:17:42 9    it is telling that there has not been any proposed

11:17:47 10   construction by the Plaintiff for any of these terms.  The

11:17:51 11   Plaintiff just asserts that it's the plain and ordinary

11:17:51 12   meaning.

11:17:55 13          And this is sort of the nose of wax problem that

11:17:59 14   we're concerned about that if you have actual number and

11:18:03 15   maximum number and you compare those numbers and somehow it

11:18:07 16   incorporates the use of position data, a person of ordinary

11:18:12 17   skill in the art just isn't going to understand what the

11:18:15 18   construction of the term is and they won't know whether they

11:18:19 19   are performing the recited comparison of those two numbers

11:18:22 20   or not.

11:18:25 21          THE COURT:  All right.  Mr. Helge, does it bring

11:18:29 22   into question what a maximum number means if a number isn't

11:18:34 23   a number, it means something else?

11:18:37 24          MR. HELGE:  No, not at all, Your Honor.  And I

11:18:39 25   disagree that we're trying to incorporate anything into the

claim.  I think, again, a POSITA is not going to read the
number in isolation.  They're going to read claim 1, they're
going to read claim 4, they're going to read claim 6,
they're going to read claim 8.  They're going to understand
that claim 4 is determining from the received position.  We
have the received positions right there in claim 1(b),
serving from the received positions of the other user's
avatar to be displayed.  So we know from step 1 you're going
to look at the positions to make a decision on what to be
displayed.  Then we go to step 4, we recognize that step
1(b), it doesn't have to be the entirety of the determining
from the position a set of other users avatars, but it's
part of that step.  Further comprises, so we know that it
doesn't -- I'm sorry, step 1(b) comprises, it doesn't have
to be all of claim 4 as the entirety of claim 1(b), it's
simply a part of it.

          And it's an idea of looking at as an additional
part of that determining figuring out how many avatar
positions you have received recognizing that there is a
maximum number, ten.  In fact, Your Honor, that can simply
be a number.  It can be a fixed number, it can be a slider
setting, it could be a slider setting in, you know, in the
software where the client says boy, my game is getting a
little laggy, my processor is bad, my network is getting
bogged down, my avatar is starting to jump.  I'm going to

11:20:15 1    reduce twenty avatars down to ten and I'm hoping I'm going
11:20:18 2    to get a smoother game.  The computer will take that number
11:20:21 3    and say as part of the determining step of 1(b), the
11:20:25 4    computer will exclude or, you know, will not decide to
11:20:29 5    display those additional ten from the ten to twenty.
11:20:32 6            And then the comparing of the actual number, I
11:20:35 7    don't think that there is anything that a POSITA would be
11:20:38 8    confused about saying I have thirty avatars, will I display
11:20:42 9    them all?  No, I'm only going to display the max number,
11:20:46 10   whatever that setting may be.  And again with 1(b), it's
11:20:49 11   part of determining from received positions the set that are
11:20:51 12   to be displayed.  So I don't think we're trying to read
11:20:55 13   anything in.  And I don't think there is any confusion being
11:20:58 14   created by referring to a max number of the others that can
11:21:02 15   be displayed.  It's really just setting a limit of how many
11:21:05 16   rows in this table will be processed as part of displaying a
11:21:08 17   frame.
11:21:13 18           THE COURT:  Okay.  Mr. Sacksteder, anything you
11:21:18 19   want to add?
11:21:19 20           MR. SACKSTEDER:  I just think that that
11:21:22 21   description is inconsistent with the language in the claim.
11:21:22 22   The claim says comparing the actual number to the maximum
11:21:22 23   number to determine which of the other users' avatars are to
11:21:32 24   be displayed.  It doesn't say that there are tens that are
11:21:32 25   the actual number and eight need to be displayed, you

11:21:42 1   display two, you don't know which two and the claim doesn't

11:21:45 2   provide any guidance for a person of ordinary skill to make

11:21:48 3   that determination.

11:21:50 4          THE COURT:  Okay.  All right.  So thank you for

11:21:57 5   the arguments.  I need a little bit of time to go back and

11:22:03 6   think about a few things that I heard today and come up with

11:22:08 7   my ruling.  So I'm going to ask that -- I'm going to hang up

11:22:12 8   now and I'll ask that everyone get back on the phone at

11:22:16 9   let's say 11:45, and I'll rule on what terms I think I can

11:22:23 10  rule on.  So I will talk with you all in a little bit at

11:22:27 11  11:45.  Thank you.

11:22:33 12         (A brief recess was taken.)

11:48:04 13         THE COURT:  Thank you for the arguments today.

11:48:22 14  They were helpful.  At issue we have one patent.  We

11:48:26 15  originally had seven disputed claim terms, but we came to

11:48:30 16  some agreements during the call.

11:48:32 17         I am prepared to rule on each of the disputes.

11:48:35 18  I will not be issuing a written opinion, but I will issue an

11:48:40 19  order stating my rulings.  I want to emphasize before I

11:48:44 20  announce my decisions that, although I am not issuing a

11:48:47 21  written opinion, we have followed a full and thorough

11:48:49 22  process before making the decisions I am about to state.  I

11:48:52 23  have reviewed the patent in dispute.  I have also reviewed

11:48:55 24  the portions of the prosecution history, the District of

11:48:59 25  Massachusetts decision, the final written decision of the

PTAB, the invalidity contentions, the dictionary definitions, and the expert declaration of Dr. Craig Rosenberg submitted by Defendant, all of which were included in the joint appendix.  There was full briefing on each of the disputed terms.  There was also a tutorial on the technology submitted by Plaintiff.  And there has been argument here today.  All of that has been carefully considered.

Now as to my rulings.  As an initial matter, I am not going to read into the record my understanding of claim construction law and definiteness generally.  I have a legal standard section that I have included in earlier opinions, including somewhat recently in *Quest Diagnostics Investments LLC v. Laboratory Corporation of America Holdings*, C.A. No. 18-1436.  I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.

Plaintiff has suggested that a person of ordinary skill in the art "would have had the equivalent, through education or practical experience, of a bachelor's degree in computer science or a related field, and at least two years of experience developing, programming/encoding, or implementing networked virtual environments."  Defendant has suggested a substantially similar definition, with the caveat that "additional education or experience may serve as

11:50:33 1    a substitute for these requirements."

11:50:35 2            Neither party has asserted that the differences

11:50:38 3    are relevant to claim construction.  And Defendant has

11:50:41 4    stated that it does not dispute Plaintiff's definition for

11:50:44 5    claim construction purposes.  And thus, I will adopt

11:50:47 6    Plaintiff's proposed definition for this ruling.

11:50:50 7            Now the disputed terms:

11:50:52 8            The first term is "avatar" in claims 1, 4, 6 and

11:50:55 9    8.  Plaintiff asserts that the term should be construed to

11:51:00 10   mean "a graphical representation of a user in

11:51:03 11   three-dimensional form."  Defendant argues that the term

11:51:05 12   should be construed as "a graphical representation of a

11:51:09 13   user."

11:51:09 14           The dispute centers on whether the avatar must

11:51:12 15   be three-dimensional.  Here, I agree with Defendant and will

11:51:16 16   construe the term to mean "a graphical representation of a

11:51:19 17   user," without the additional limitation that it must be

11:51:23 18   three-dimensional.  That is consistent with the ordinary

11:51:26 19   meaning of avatar that the parties agree on.

11:51:28 20           That construction is also supported by the

11:51:36 21   intrinsic evidence.  The claims state that each user or each

11:51:40 22   client process has an avatar associated with it and that

11:51:43 23   each avatar may change position.  Nothing in the claim

11:51:46 24   language requires the avatar to be three-dimensional.  There

11:51:51 25   is nothing that relates to any three-dimensional

characteristic of avatars, nor is there any indication that the performance of steps in the claims is dependent on the avatars having three dimensions.

The specification does not define "avatar." Plaintiff, however, points to a number of places in the specification to support its construction.  First, Plaintiff points to the Abstract and Summary of Invention which both read:  "The present invention provides a highly scalable architecture for a three-dimensional graphical, multi-user, interactive virtual world system."  And although those statements reference "the present invention," they do not specify that the avatars themselves should be of any particular number of dimensions.  About the avatars, the Summary of Invention simply says that "[t]he virtual world shows avatars representing the other users who are neighbors of the user viewing the virtual world."

The specification describes an avatar as being "a three-dimensional figure chosen by a user to represent the user in the virtual world" only in the Description of the Preferred Embodiment.  That section itself states that it is "illustrative and not descriptive" and that "[t]he scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents."

11:53:30 1          In short, the portions of the specification

11:53:32 2   referring to three-dimensional avatars are citations to

11:53:35 3   preferred embodiments.  The Federal Circuit has cautioned

11:53:39 4   against reading limitations from embodiments in the

11:53:42 5   specification into the claims in cases such as *CCS Fitness,*

11:53:47 6   *Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir.

11:53:55 7   2002) and *Superguide Corp. v. DirecTV Enters., Inc.,* 358

11:54:01 8   F.3d 870, 875 (Fed. Cir. 2004).  I will heed that caution.

11:54:09 9          Additionally, the continuation applications

11:54:11 10  related to the patent-in-suit support the Court's

11:54:14 11  construction.  In the '501 Patent and the '998 Patent, the

11:54:17 12  patentees expressly claimed a "three-dimensional avatar."

11:54:27 13  In the '998 Patent, the patentees claimed both "avatar" and

11:54:35 14  "three-dimensional avatar" suggesting that the two terms

11:54:38 15  refer to different things.

11:54:40 16         In circumstances such as this, terms should be

11:54:43 17  interpreted consistently across patents.  Adopting

11:54:47 18  Plaintiff's proposed construction of "avatar" would render

11:54:50 19  the term "three-dimensional avatar" in the continuation

11:54:52 20  patents meaningless and would violate the principle that

11:54:57 21  "[d]ifferent claim terms are presumed to have different

11:54:59 22  meanings."

11:55:02 23         Moreover, the fact that the patentees later

11:55:02 24  specified "three-dimensional avatar" shows that the

11:55:06 25  patentees could have done so during prosecution of the

11:55:09 1    patent-in-suit, but chose not to.

11:55:14 2            The extrinsic evidence is also consistent with

11:55:16 3    this construction.  As I noted in referring to the

11:55:19 4    agreed-upon ordinary meaning at the time of the invention,

11:55:23 5    contemporary technical dictionaries define "avatar" as "a

11:55:28 6    graphical representation of a user" and "an image that

11:55:32 7    represents an individual's cyber presence."  Neither of

11:55:36 8    these definitions requires that an avatar be

11:55:39 9    three-dimensional.

11:55:40 10           Finally, I understand that the District of

11:55:42 11   Massachusetts previously construed the term differently.  I

11:55:46 12   have reviewed that decision, and the final written decision

11:55:49 13   of the PTAB, which the Massachusetts court did not have.  I

11:55:53 14   find the reasoning of the PTAB more persuasive.

11:55:56 15           Thus, I decline to read in Plaintiff's proposed

11:56:00 16   requirement that the avatar be three-dimensional and will

11:56:03 17   instead construe the term to mean "a graphical

11:56:06 18   representation of a user."

11:56:08 19           The second term is "client process" in claims 1,

11:56:12 20   4, 6 and 8.  During the argument today, the parties agreed

11:56:15 21   to the construction "a program executed on a user's computer

11:56:19 22   to provide access to a server."  I will adopt that

11:56:22 23   construction.

11:56:24 24           The third term is "server process" in claims 1,

11:56:26 25   6 and 8.  During the argument today, the parties also agreed

to the construction "a program executed by one or more computers that provide one or more services to users of computers across a network."  I will also adopt that construction.

The fourth term is "receiving a position of less than all of the other users' avatars" in claim 1.  Plaintiff contends this term should be given its plain and ordinary meaning.  Defendant argues that the term should be construed as "receiving position data for up to a set of maximum number N of the other users' avatars nearest to the user's avatar, which is less than the total number of other users' avatars."

There are two areas of dispute.  One, whether there is a predetermined number N which sets the maximum number of avatars the server will send to the user.  And two, whether the subset of the avatars sent to the user must be those nearest the user.  As to both, I agree with Plaintiff and will construe the term to have its plain and ordinary meaning.

As to a maximum number of avatars, the claim itself does not reference a predetermined maximum number of avatars.  Claim 1 states only that the client process receives "a position of less than all of the other users' avatars."  Although the specification discusses a preferred embodiment in which the server "maintains a variable, N,

which sets the maximum number of other avatars," the
language of the claim is broader.  If the patentees had
intended to import this limitation into claim 1, they could
have done so.  Plaintiff points to claim 4 as an example of
the patentees doing just that in another instance.  That
claim specifies that the client process "determin[es] a
maximum number of the other users' avatars to be displayed,"
which shows that the patentees chose when to specify the
existence of a predetermined maximum number of avatars.  The
fact that the patentees did not include this requirement in
claim 1 counsels against importing such a limitation from
the specification.

As to the position of avatars, the claims again
do not specify that the server process sends the positions
of those avatars nearest to the user.  Rather, they simply
state that it is a subset which is "less than all of the
other users' avatars."  Defendant argues that proximity is
the determining factor because the specification repeatedly
states that the client will display "neighboring" avatars.
The specification, however, also states that "the definition
of 'neighboring' might be controlled by other factors
besides proximity," and lists examples such as using "video
telephone objects" or filtering by user ID.

Therefore, I will construe this term to have its
plain and ordinary meaning.

11:59:53 1          I am going to address the final three terms

11:59:55 2   together.

11:59:56 3          The fifth term comprises two similar phrases:

11:59:59 4   "determining from the received positions an actual number of

12:00:02 5   the other users' avatars" and "determining an actual number

12:00:07 6   of avatars that are not associated with the client process

12:00:11 7   based on the positions transmitted by the server process,"

12:00:15 8   which are in claims 4 and 8, respectively.

12:00:18 9          The sixth term is "determining a maximum number

12:00:21 10  of [the other users'] avatars [to / that can] be displayed"

12:00:28 11  in claims 4 and 8.

12:00:30 12         The seventh term is "comparing the actual number

12:00:33 13  to the maximum number to determine which of the [other

12:00:36 14  users'] avatars are to be displayed" in claims 4 and 8.

12:00:42 15         For each of these, Plaintiff asserts that the

12:00:45 16  term should be given its plain and ordinary meaning.

12:00:47 17  Defendant asserts that each term is indefinite.

12:00:50 18         For these terms, on the record before me, I

12:00:52 19  conclude that Defendant has not met its burden to show that

12:00:55 20  these terms are indefinite.  That being said, I am not yet

12:01:01 21  ready to conclude that they are definite.  Should there

12:01:02 22  still be a disagreement regarding these claim terms in the

12:01:02 23  future, Defendant may raise the issue later, if appropriate,

12:01:11 24  after full fact and expert discovery.

12:01:11 25         So that is my ruling.  Is there anything else

61

12:01:21 1    that we need to discuss while we are on the phone?

12:01:26 2                    From the Plaintiff?

12:01:29 3                    MR. HELGE:  No, Your Honor.

12:01:34 4                    THE COURT:  For the Defendant?

12:01:36 5                    MR. SACKSTEDER:  Nothing from Defendant, Your

12:01:38 6    Honor.

12:01:38 7                    THE COURT:  Okay.  Thank you everyone.  Have a

12:01:41 8    good weekend.

        9                    (Markman remote hearing concluded at 12:01 p.m.)

        10

        11              I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.
        12

        13                              /s/ Dale C. Hawkins
                                     Official Court Reporter
        14                           U.S. District Court

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25